WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Henry, Jr., | CIV 13-8268-PCT-JAT (MHB) |
| Petitioner, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Charles Ryan, et al., | |
| Respondents. | |

TO THE HONORABLE JAMES A. TEILBORG, UNITED STATES DISTRICT COURT:

On November 12, 2013, Petitioner John Henry, Jr., who is confined in the Arizona State Prison Complex-Lewis in Buckeye, Arizona, filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1). Respondents filed an Answer on February 19, 2014 (Doc. 9). Despite having an opportunity to do so, Petitioner has not filed a traverse.

## **BACKGROUND**[1]

The presentence report provides the following information regarding the crimes charged in Mohave County Superior Court case numbers CR2001-1180 and CR2001-1182:

> Regarding CR-2001-1180, the following offense information has been obtained from the Mohave County Sheriff's Office, DR#2001-20351.
>
> On August 17, 2001 at 12:38 am, Mohave County Sheriff's units were dispatched to an alarm from Pawn World II, at 2570 Northern Avenue, Kingman. An unidentified person(s) had broken the business' front glass door and three glass cases inside, causing damage estimated, by owner Gerald

---

[1] Unless otherwise noted, the following facts are derived from the exhibits submitted with Doc. 9 – Respondents' Answer.

Homer, at $3,000.00. Twelve (12) handguns were taken: one Colt (.357), five Jennings (two .380s and three 9mms), three Taurus (a .40 caliber, a .45 caliber, and a 9mm), two Barettas (a .40 caliber and 9mm), and one KBI (a .380 automatic). Estimated value of all the firearms was $3,170.00. Blood was also found on two cases and Homer's other pawn shop, Pawn World on Beale Street, also had windows smashed in another attempted burglary.

On August 18, 2001 Kingman Police Department recovered the KBI .380 handgun after it was found by in a field next to Wal-Mart.

On August 21, 2001 Officers were informed by Kingman Police Department John Henry Jr. (18), a white male, and James Derrick Harrison (18), a black male, had been involved in an armed robbery and pursuit in which officers had been fired upon. When both men had been arrested, they were found in possession of two handguns stolen from Pawn World II: the Colt .357 (valued at $549.00) and the Baretta 9mm (valued at $299.00).

Harrison told the police he and Henry had taken the two guns from a black man near the Fairgrounds. Henry declined to speak with Kingman Police Detective Spivey regarding his arrest charges without an attorney. However, he did speak to Mohave County Sheriff's Detective David Reif about the Pawn World II firearms.

John Henry initially stated he found the Colt and the Baretta along side Stockton Hill Road, and then Harrison had shown up with them near the Fairgrounds. Confronted with information that blood evidence was found at Pawn World II, Henry then stated he had been drunk when he and another person had broken into Pawn World II through the front door late. Henry said he wanted to "pay off some stuff" and his "stupidity got the best of him". Henry said he gave the firearms to someone who split $500.00 with Henry and they got rid of them out-of-state. Henry believed the blood evidence was his, indicating he had cut his hand, and said the guns he and Harrison had came from the desert in the past two days and were to be sold. He said he didn't know anything about the pistol found near Wal-Mart and did not want to identify anyone due to fear of retribution.

Detective Reif also interviewed James Harrison, who said he'd been hanging around with Johnny for about a month. Harrison initially claimed he and Henry took the guns from a black man peddling them near the Fairgrounds. He then said that was not true and Henry had brought the guns to him without saying from where they had come. Harrison said they had the pistols for four or five days and a couple nights before they had gotten an older man to purchase handgun ammunition for them at Wal-Mart. Harrison denied involvement in the Pawn World burglaries.

Regarding CR-2001-118[2], the following offense information has been obtained from the Kingman Police Department, DR#2001-16554.

On August 21, 2001 about 1:04 pm, police responded to an armed robbery call at the Circle K Store, 2104 Kingman Avenue. Employees Wanda Ryan (43) and Tod Brummett (29) let officers police inside the store. Brummett's father, Gene Brummett (55) had also been outside the store talking to his son during the robbery. When the black gunman wearing a white bandana over his mouth was leaving the store, he pointed his handgun at them and fired, but had apparently run out of bullets. Tod Brummett and his father, who was on a

- 2 -

motorcycle, began chasing the masked man: the elder Brummett trying to run the gunman down with his motorcycle.

Investigation revealed multiple gunshots had been discharged inside the store by the black gunman, who robbed the female clerk at gunpoint and threatened the two male witnesses. The gunman had then fled with another subject in a truck. Ms. Ryan reported one had been fired near her at shoulder height, but no one was physically injured. Police recovered eight (8) spent shell casings inside Circle-K. An "intact round" was found to have penetrated multiple packs of tobacco products before coming to a rest on the floor near the ice cream freezer. Another spend 9mm casing was found in the parking lot – apparently discharged by the gunman towards the store as he exited.

Also about 1:04 pm, Kingman Police Sergeant Jim Brice observed the suspect's vehicle traveling without lights northbound on Harrison. Seeing the Toyota pickup's lights come on, Brice turned his unit and pursued the truck with his siren and emergency lights. The truck continued on Harrison, occasionally braking hard and shifted as it did so. Brice noticed the fugitive truck did not stop for traffic signs on Harrison or as it turned on Beverly and drove westbound at about 70 mph. The truck did not stop for the intersection at Beverly and Stockton Hill Road, but continued onto the westbound on-ramp of Interstate 40, traveling 80-85 mph.

Sgt. Brice requested DPS highway and helicopter unit assistance and was able to close within sight of the Toyota's Arizona license plate (559B55): a 1984 Toyota pickup owned by John Henry Jr. At about mile Post 50, the passenger in the Toyota, later identified as James Harrison, fired a handgun out the window at Brice, causing the officer to take evasive maneuvers to avoid being struck. The driver of the truck was later identified as John Henry Jr.

Kingman Police Officer Dave Coffin also caught up with the Toyota, which then exited I-40 on the westbound off-ramp at Andy Devine. There the pickup lost control and slide onto the median, slowing to about 5 mph, until it again accelerated westbound to N-93. Officer Coffin noted the truck now appeared to be leaking radiator fluid. On N-93 at Coyote Pass, the passenger again fired a handgun at Brice and Coffin. Officers continued pursuit as the truck took the offramp onto Hwy 68, still westbound – Coffin noting the passenger threw something from the pickup, later discovered to be an empty ammunition box.

Sgt. Brice reported the Toyota's passenger, Harrison, "would fire 7 to 8 rounds out of a handgun of some sort. Then 5 to 6 rounds from another type of gun. The muzzle flashes were larger. I could hear the shots being fired. Empty casings were striking my vehicle." Thereafter, Brice observed the passenger again began firing what sounded to be two different guns from a hole in the Toyota's tinted rear window: again discharging 7 to 8 rounds from one and then 5 to 6 from the other. According to Brice, the muzzle flashes and reports were distinctively different for the two weapons fired at him. Officer Coffin noted the lull between rounds of gunfire was consistent with the passenger reloading.

Sgt. Brice reported "The vehicle began to smoke" (the engine had blown) and slowed to about 30 mph. "I heard a volley of gun fire from the truck and observed several muzzle flashes." The vehicle "came to a rest west bound on Hwy 68" about MP 16.5 and both Harrison and Henry put their empty hands outside the truck's windows and were arrested without further incident. Brice

> observed his patrol unit had windshield and hood nicks from Harrison's discharged shell casings and his driver's side tire had gone flat due to a gunshot – the bullet being recovered inside. Two firearms stolen from the Pawn World II burglary on August 17 (a 9mm and .357) were found inside the truck, on the floorboard. Officers also recovered a video tape from Officer Coffins' unit.
>
> Interviewed by police, James Harrison said he and John Henry had decided to rob the Circle K earlier that evening and made plans accordingly. Harrison said while Henry waiting in the truck, he went inside and demanded money from the female cashier. When she looked at him as if she doubted he was serious, Harrison said he "popped it off twice" (the handgun) and she started putting money in a bag like she was told. "Harrison said he fired several shots from the gun while he was inside the store and he then left after getting the money." Harrison said, "Two guys started chasing after him and one of them was on a motorcycle and tried to run him over. He said he turned toward the two individuals and pointed the gun at them and attempted to fire the gun, but it did not shoot." Harrison said he dropped some of the store's money, but got into the truck and left with Henry. Harrison admitted he shot out the rear window of the truck while firing during the pursuit, but said he was "mostly shooting in the air or on the ground" to get police to stop chasing them. He said he used up one entire box of ammunition for each handgun during the pursuit, throwing out the empty boxes along the way, and used hollow points for the .357.
>
> James Harrison said he and Henry had been drinking earlier. Harrison said he shot two rounds into the air/ceiling at Circle K and believed he got $150.00 to $200.00 from the clerk. He said he committed the robbery because his girlfriend was pregnant and he needed the money.
>
> John Henry declined to speak with officers at that time without an attorney, however indicated he had stolen the firearms used at Pawn World II on August 16, 2001. Henry also stated, "I was just asked to go to the store. We were pretty messed up, and I passed out in the truck."

(Exh. A.)

On August 30, 2001, the State filed an indictment in case number CR2001-1182, charging Petitioner with one count of armed robbery, five counts of aggravated assault, one count of unlawful flight from a pursuing law enforcement vehicle, and two counts of attempted first degree murder. (Exh. B.) In a separate indictment filed the same day in case number CR2001-1180, the State also charged Petitioner with one count of burglary in the first degree, one count of criminal damage, one count of theft, and one count of trafficking in stolen property. (Exhs. C, D.) Prior to trial, Petitioner entered into a plea agreement with the State, pleading guilty to one count of burglary in the first degree, one count of theft, one count of armed robbery, three counts of aggravated assault, and one count of unlawful flight

from a pursuing law enforcement vehicle. (Exhs. E, F.) On January 2, 2002, the trial court sentenced Petitioner to concurrent and consecutive terms totaling 20 years in prison. (Exh. G.) Petitioner was also ordered to serve a term of 3.75 years of community supervision. (Exh. G.)

On January 8, 2002, Petitioner filed his first notice of post-conviction relief. (Exh. H.) On September 19, 2002, appointed post-conviction counsel filed a notice advising the court that, after corresponding with Petitioner and reviewing the trial documents, she was "unable to find any claims for relief to raise in post-conviction proceedings." (Exh. I.) Petitioner was subsequently granted leave to file a pro per petition for post-conviction relief, but he failed to do so. (Exh. J.) On November 20, 2002, noting that no petition had been filed, the court denied the request for post-conviction relief and dismissed the post-conviction proceedings. (Exh. K.) On June 10, 2004, Petitioner filed a second, untimely, notice of post-conviction relief. (Exh. L.) On July 19, 2004, the trial court denied the request for post-conviction relief and dismissed the post-conviction proceedings, noting that Petitioner's notice of post-conviction relief was both untimely under Arizona Rule of Criminal Procedure 32.4(a) and precluded under Arizona Rule of Criminal Procedure 32.2(a). (Exh. M.)

On May 30, 2012, Petitioner filed a motion for correction of error in the trial court claiming: (1) that the court erred by not imposing a term of community supervision as required by law and (2) that the court erred by imposing consecutive sentences. (Exh. N.) The trial court amended the sentencing order to reflect a term of community service totaling 2 years and 10 months, rather than 3 years and 9 months. (Exh. O.) The court, however, rejected Petitioner's second claim. (Exh. O.) Petitioner subsequently filed a "motion for reconsideration of motion for correction of error." (Exh. P.) That motion was denied. (Exh. Q.) Petitioner then filed a Petition for Writ of Habeas Corpus in the Arizona Supreme Court, which was denied on December 12, 2012. (Exhs. R, S.)

On November 12, 2013, Petitioner filed the instant habeas petition pursuant to 28 U.S.C. § 2254 raising two grounds for relief. (Doc. 1.) In Ground One, Petitioner alleges that his Sixth, Eighth, and Fourteenth Amendment rights were violated because he was

denied a fair sentencing hearing and was prejudiced by the state court's intentional failure to comply with mandatory sentencing guidelines. In Ground Two, he asserts that the sentencing court violated the Fifth Amendment prohibition against double jeopardy by imposing consecutive, rather than concurrent, sentences.

## DISCUSSION

In their Answer, Respondents contend that Petitioner's habeas petition is untimely and, as such, must be denied and dismissed.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a statute of limitations on federal petitions for writ of habeas corpus filed by state prisoners. See 28 U.S.C. § 2244(d)(1). The statute provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

An "of-right" petition for post-conviction review under Arizona Rule of Criminal Procedure 32, which is available to criminal defendants who plead guilty, is a form of "direct review" within the meaning of 28 U.S.C. § 2244(d)(1)(A). See Summers v. Schriro, 481 F.3d 710, 711 (9th Cir. 2007). Therefore, the judgment of conviction becomes final upon the conclusion of the Rule 32 of-right proceeding, or upon the expiration of the time for seeking such review. See id.

Additionally, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the limitations period. 28 U.S.C. § 2244(d)(2); see Lott

1 v. Mueller, 304 F.3d 918, 921 (9th Cir. 2002). A post-conviction petition is "clearly pending
2 after it is filed with a state court, but before that court grants or denies the petition." Chavis
3 v. Lemarque, 382 F.3d 921, 925 (9th Cir. 2004). A state petition that is not filed, however,
4 within the state's required time limit is not "properly filed" and, therefore, the petitioner is
5 not entitled to statutory tolling. See Pace v. DiGuglielmo, 544 U.S. 408, 413 (2005). "When
6 a postconviction petition is untimely under state law, 'that [is] the end of the matter' for
7 purposes of § 2244(d)(2)." Id. at 414.

8       In Arizona, post-conviction review is pending once a notice of post-conviction relief
9 is filed even though the petition is not filed until later. See Isley v. Arizona Department of
10 Corrections, 383 F.3d 1054, 1056 (9th Cir. 2004). An application for post-conviction relief
11 is also pending during the intervals between a lower court decision and a review by a higher
12 court. See Biggs v. Duncan, 339 F.3d 1045, 1048 (9th Cir. 2003) (citing Carey v. Saffold,
13 536 U.S. 214, 223 (2002)). However, the time between a first and second application for
14 post-conviction relief is not tolled because no application is "pending" during that period.
15 See id. Moreover, filing a new petition for post-conviction relief does not reinitiate a
16 limitations period that ended before the new petition was filed. See Ferguson v. Palmateer,
17 321 F.3d 820, 823 (9th Cir. 2003).

18       The statute of limitations under the AEDPA is subject to equitable tolling in
19 appropriate cases. See Holland v. Florida, 560 U.S. 631, 645-46 (2010). However, for
20 equitable tolling to apply, a petitioner must show "'(1) that he has been pursuing his rights
21 diligently and (2) that some extraordinary circumstances stood in his way'" and prevented
22 him from filing a timely petition. Id. at 2562 (quoting Pace, 544 U.S. at 418).

23       The Court finds that Petitioner's Petition for Writ of Habeas Corpus is untimely.
24 Petitioner was sentenced under the plea agreement on January 2, 2002. (Exhs. E, F, G.) On
25 January 8, 2002, Petitioner filed a timely notice of PCR. (Exh. H.) The state court, however,
26 summarily dismissed the matter on November 20, 2002, after Petitioner failed to file a PCR
27 petition. (Exh. K.) Petitioner did not file a petition for review from this summary dismissal
28 in the Arizona Court of Appeals or the Arizona Supreme Court. Thus, Petitioner's state court

1  conviction became final on December 20, 2002 – 30 days after the state court dismissed the
2  PCR proceeding, because the statute was tolled during the time he could have filed a petition
3  for review in the Arizona Court of Appeals. See Ariz.R.Crim.P. 32.9(c) ("Within thirty days
4  after the final decision of the trial court on the petition for post-conviction relief or the
5  motion for rehearing, any party aggrieved may petition the appropriate appellate court for
6  review of the actions of the trial court.").  The statute of limitations began to run on
7  December 20, 2002 – and expired one year later – on December 22, 2003.[2]

8        Petitioner's commencement of a second PCR proceeding on June 10, 2004, did not
9  toll the limitations period.  The trial court dismissed Petitioner's second PCR proceeding,
10 finding that Petitioner could not raise his claims in an untimely PCR proceeding and,
11 additionally, he was precluded from relief on his claims because they could have been raised
12 in his prior PCR proceeding. (Exh. M.)  Because the state court dismissed the PCR notice
13 as untimely, the proceeding was not "properly filed" under 28 U.S.C. § 2244(d)(2) and did
14 not toll the statute of limitations. See Pace, 544 U.S. at 414-17 (finding that post-conviction
15 proceeding that is rejected by state courts on timeliness grounds is not "properly filed" under
16 28 U.S.C. § 2244(d)(2)); Bonner v. Carey, 425 F.3d 1145, 1148-49 (9th Cir. 2005); see also
17 Ferguson, 321 F.3d at 823 ("Like the Eleventh Circuit, we hold that section 2244(d) does not
18 permit the re-initiation of the [federal 1-year] limitations period that has ended before the
19 state petition was filed.").

20       Likewise, Petitioner's subsequent pleadings – motion for correction of error in the trial
21 court, motion for reconsideration of motion for correction of error, and petition for writ of
22 habeas corpus in the Arizona Supreme Court did not toll the limitations period.  These
23 pleadings were filed after the statute of limitations ended and could not restart the expired
24 1-year limitations period. See Ferguson, 321 F.3d at 823.

---

[2] The end date fell on Saturday, December 20, 2003.  Thus, the statute of limitations expired on Monday, December 22, 2003.

- 8 -

In sum, Petitioner filed the instant habeas petition almost 10 years after the 1-year limitations period expired. The Petition is therefore untimely.

The Ninth Circuit recognizes that the AEDPA's limitations period may be equitably tolled because it is a statute of limitations, not a jurisdictional bar. See Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1288 (9th Cir. 1997), overruled in part on other grounds by Calderon v. United States Dist. Ct. (Kelly), 163 F.3d 530, 540 (9th Cir. 1998). Tolling is appropriate when "'extraordinary circumstances' beyond a [petitioner's] control make it impossible to file a petition on time." Id.; see Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002) (stating that "the threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule") (citations omitted). "When external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of limitations may be appropriate." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999). A petitioner seeking equitable tolling must establish two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace, 544 U.S. at 418. Petitioner must also establish a "causal connection" between the extraordinary circumstance and his failure to file a timely petition. See Bryant v. Arizona Attorney General, 499 F.3d 1056, 1060 (9th Cir. 2007).

Petitioner has not proffered any extraordinary circumstance that would justify equitable tolling or demonstrated that an external impediment hindered the diligent pursuit of his rights. And, in any event, Petitioner's *pro se* status, indigence, limited legal resources, ignorance of the law, or lack of representation during the applicable filing period do not constitute extraordinary circumstances justifying equitable tolling. See, e.g., Rasberry v. Garcia, 448 F.3d 1150, 1154 (9th Cir. 2006) ("[A] *pro se* petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling.").

Accordingly, Petitioner is not entitled to equitable tolling and his habeas petition is untimely.

**CONCLUSION**

Having determined that Petitioner's habeas petition is untimely, the Court will recommend that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1) be denied and dismissed with prejudice.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the Petition is justified by a plain procedural bar and jurists of reason would not find the procedural ruling debatable.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen days within which to file a response to the objections. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. See Rule 72, Federal Rules of Civil Procedure.

DATED this 27th day of June, 2014.

*Michelle H. Burns*
Michelle H. Burns
United States Magistrate Judge